**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| RCA LABORATORY SERVICES, LLC, a Delaware Limited Liability Company, D/B/A GENETWORx 2201 Renaissance Blvd., 3rd Floor King of Prussia, PA  19406 <br><br> Plaintiff, <br><br> v. <br><br> THE SPRINGS LIVING, LLC Dba THE SPRINGS LIVING c/o Registered Agent Solutions, Inc. 7185 SW Sandberg Street, Suite 110 Portland, OR 97223 <br><br> Defendant. | Case No. 3:23-cv-855 |

**DEFENDANT THE SPRINGS LIVING LLC'S TRIAL BRIEF**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................................1

II.   FACTUAL OVERVIEW ...............................................................................................3

    A.    Structure and Business of The Springs Living ...................................................3

    B.    Structure and Business of Genetworx.................................................................4

    C.    The Execution of the Laboratory Services Agreement........................................5

    D.    Genetworx's Standard Operating Procedures ....................................................8

        1.    Receipt of processing of specimens .........................................................8

        2.    Genetworx's Revenue Cycle department...................................................9

        3.    Genetworx process for billing third-party payors ...................................10

        4.    Genetworx invoicing process...................................................................11

    E.    The Amendment to the LSA ............................................................................12

    F.    The Cigna Clawback ........................................................................................14

    G.    The Present Payment Dispute ...........................................................................14

    H.    ODHS reimbursement .......................................................................................15

    I.    Genetworx's Executive Summary/Damages Spreadsheet .................................17

III.   LEGAL ANALYSIS...................................................................................................18

    A.    Genetworx Cannot Enforce the LSA because It Breached Its Material Obligation of Using Commercially Reasonable Efforts to Bill Accessions to Third-Party Payors. ....................................................................................18

    B.    Genetworx's Obligation to Use Commercially Reasonable Efforts to Bill Accessions to Third-Party Payors was not Dependent on The Springs Living Providing Insurance Information with Each Requisition. ..........................20

    C.    Genetworx Failed to Credit The Springs Living with Payments Received by Third-Party Payors. ....................................................................................24

    D.    The Springs Living's Purported Failure to Provide Insurance Information with Each Requisition did not Cause Genetworx's Damages. .............................24

    E.    Genetworx's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing is Duplicative of Its Breach of Contract Claim................................25

    F.    Genetworx's Claim for Account Stated Fails because The Springs Living Never Consented or Acquiesced to Any Amounts Genetworx Claims It Owes. ................................................................................................................25

    G.    Genetworx's Claims for Quantum Meruit and Unjust Enrichment Fails as a Matter of Law because the LSA is an Enforceable Written Contract.................25

IV.   CONCLUSION...........................................................................................................26

# **TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*BAE Sys. Ordnance Sys. v. Fluor Fed. Sols., LLC*,
   Civil Action No. 7:20-cv-587, 2024 U.S. Dist. LEXIS 17020 (W.D. Va. Jan.
   31, 2024) ...................................................................................................................19

*Bryant v. Washington Mut. Bank*,
   524 F. Supp. 2d 753 (W.D. Va. 2007), aff'd, 282 F. App'x 260 (4th Cir. 2008)....................16

*Carley Capital Group v. City of Newport News*,
   709 F. Supp. 1387 (E.D. Va. 1989) ..............................................................................16

*E. Claiborne Robins Co. v. Teva Pharm. Indus.*,
   Civil Action No. 3:18cv827, 2020 U.S. Dist. LEXIS 177033 (E.D. Va. Sep.
   25, 2020) ...................................................................................................................16

*E. Claiborne Robins Co. v. Teva Pharm. Indus.*,
   No. 3:18cv827 (DJN), 2022 U.S. Dist. LEXIS 35232 (E.D. Va. Feb. 28, 2022) ..............17, 18

*Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*,
   542 F. Supp. 2d 452 (E.D. Va. 2008) ...........................................................................22

*Johnson v. Washington*,
   E.D. Va. No. CIV.A. 2:07CV204, 2008 WL 850690 (E.D. Va. Mar. 12, 2008)....................16

*JTH Tax, LLC v. Shahabuddin*,
   477 F. Supp. 3d 477 (E.D. Va. 2020) ...........................................................................23

*L&E Corp. v. Days Inns of America, Inc.*,
   992 F.2d 55 (4th Cir. 1993) ........................................................................................22

*McPike v. Zero-Gravity Holdings, Inc.*,
   280 F. Supp. 3d 800 (E.D. Va. 2017) ...........................................................................23

*Multiscaff Ltd. v. Aptim Fed. Servs., LLC*,
   No. 1:23cv1369(DJN), 2024 U.S. Dist. LEXIS 11246 (E.D. Va. Jan. 22, 2024)....................18

*Soroof Trading Dev. Co. v. GE Fuel Cell Sys. LLC*,
   842 F. Supp. 2d 502 (S.D.N.Y. 2012)...........................................................................16

*United States for Use & Benefit of McKenney's, Inc. v. Leebcor Servs., LLC,*
   622 F. Supp. 3d 165 (E.D. Va. 2022) .......................................................................22

*Virginia Elec. & Power Co. v. Bransen Energy, Inc.,*
   850 F.3d 645 (4th Cir. 2017) ...................................................................................16

**State Cases**

*Drs. Co. v. Women's Healthcare Assocs., Inc.,*
   285 Va. 566 (2013) ..................................................................................................18

*Ellison v. Weintrob,*
   139 Va. 29, 123 S.E. 512 (1924)..............................................................................23

*Haass & Broyles Excavators, Inc. v. Ramey Bros. Excavating Co.,*
   355 S.E.2d 312 (1987) .............................................................................................22

*Video Zone, Inc. v. KF&F Props., L.C.,*
   267 Va. 621 (2004) ..................................................................................................18

**Statutes**

Act, and the American Rescue Plan Act of 2021.............................................................3

Cares Act........................................................................................................................4, 5

Families First Coronavirus Response Act..........................................................................3

Defendant The Springs Living, LLC ("The Springs Living") submits the following Trial Brief.

## I.    **INTRODUCTION**

In this matter, Plaintiff RCA Laboratory Services, LLC dba Genetworx ("Genetworx") seeks a judgment in excess of $3.7 million against The Springs Living for laboratory services provided pursuant to a Laboratory Services Agreement ("LSA"). The LSA imposed on Genetworx the obligation to use commercially reasonable efforts to bill private insurers, Medicare, Medicaid, or, if a patient were uninsured, any available federal or state COVID-19 relief fund. The evidence to be presented at trial demonstrates that Genetworx failed to do so.

Commercially reasonable efforts imposes an obligation to act with good faith in light of one's own capabilities and in accordance with industry standards. Genetworx fell well short of this standard in its performance under the LSA. Its internal records confirm that it repeatedly failed to submit tests to payors notwithstanding that it had insurance information on file for the patients for which The Springs Living submitted tests. Its records also confirm that it repeatedly failed to seek payment from state and federal COVID-19 relief funds or to even undertake any steps to do so.

Genetworx's obligation to use commercially reasonable efforts to seek payment from third-party payors was a material consideration for The Springs Living to enter into the LSA. It would not have entered into the LSA had Genetworx not had that obligation. The Springs Living was enticed by representations made by Genetworx that The Springs Living's out-of-pocket costs for Genetworx's services would be minimal because Genetworx would first seek payment from third-party payors. Genetworx's material breach of that obligation precludes it from seeking payment from The Springs Living under the LSA.

Genetworx's primary argument is that it was prevented from billing private insurers,

Medicare, or Medicaid because The Springs Living did not provide it with correct insurance information with each test The Springs Living submitted to it. It attempts to construe the language of the LSA to make its "commercially reasonable efforts" obligation dependent on its receipt of correct and complete insurance information with each test. However, the contractual language does not condition its obligation in that manner, and the parties' course of performance confirms that was not intended. Genetworx's own standard operating procedures confirm that Genetworx would bill a test to a payor based on the insurance information on file for the patient, even if no insurance information was included with the specific test submitted to Genetworx.

If no insurance information was on file, Genetworx's standard operating procedures called for it to utilize one of its insurance discovery vendors to determine whether the patient was truly uninsured. If insurance discovery confirmed no active insurance for the patient, Genetworx was required to submit the test for payment to the Health Resources & Services Administration, which administered payment for COVID-19 testing made available pursuant to the Families First Coronavirus Response Act, the Coronavirus Aid, Relief, and Economic Security Act, and the American Rescue Plan Act of 2021. If insurance discovery indicated that a patient had active insurance, Genetworx's standard operating procedures called for it to submit the test according to the discovered insurance information.

Even for tests that were submitted to a third-party payor but were not paid due to missing information, Genetworx's performance fell well short of a commercially reasonable standard. Its standard operating procedures again called for it to make at least three attempts to contact its client before billing such a test to the client. Yet, its internal records demonstrate that it repeatedly failed to attempt contact with The Springs Living.

Genetworx also claims that it is entitled to payment from The Springs Living on payments

that were initially made by Cigna, the administrator for The Springs Living's employee health plan but which Cigna later retracted. However, Genetworx could have, but failed, to submit those payments to a COVID-19 relief fund sponsored by the state of Oregon, which reimbursed for mandatory testing of staff members at senior care facilities like those operated by The Springs Living. The state of Oregon did not even require the staff members to be uninsured. Thus, Genetworx could have submitted all tests performed for employees of The Springs Living's locations in Oregon for reimbursement to the state of Oregon, including those for which Cigna retracted payment, but it failed to do so.

Given its consistent failure to use commercially reasonable efforts to bill third-party payors for COVID-19 testing done for The Springs Living, Genetworx cannot establish any of the claims it asserts against The Springs Living. This is not a scenario where Genetworx pursued payment unsuccessfully, or where The Springs Living asked Genetworx to go above and beyond its normal methods of conducting business. Rather, this is a scenario where Genetworx simply failed to use the information in its possession and conduct business as its policies and procedures said it should. For these reasons, more fully discussed below, The Springs Living requests judgment in its favor and against Genetworx.

## II.     FACTUAL OVERVIEW

### A.     Structure and Business of The Springs Living

At the times relevant to this litigation, The Springs Living operated 18 senior living communities in Oregon and Montana. At those communities, The Springs Living offered independent living, assisted living, and memory care services. Its residents are seniors over the age of 65.

The Springs Living is private pay, meaning that its residents pay out of pocket for the services and accommodations provided at The Springs Living's communities. Other than some

contractual relationship with Medicaid, The Springs Living does not contract with insurance companies and does no medical billing. It also does not have any in-house legal staff.

Steven Berning is The Springs Living's Regional Director of Health Services. His responsibilities include oversight of health services for all of The Springs Living's communities, compliance with state regulations applicable to long term care facilities, internal policies and procedures related to health services, training and systems implementation, and, as necessary, performing day-to-day duties as a nurse. He stepped into his role just prior to the onset of the COVID-19 pandemic.

Tim Minks was the Executive Director at The Springs Living's Wilsonville, Oregon community. While serving in that role, Mr. Minks also assisted in supporting The Springs Living's communities at Sherwood and at Clackamas Woods, both of which are also located in Oregon. Mr. Minks then moved into the role of Executive Director at The Springs Living's Lake Oswego, Oregon community. He currently serves as Regional Director of Operations for The Springs Living's Montana communities.

As it concerned COVID-19 testing, each of The Springs Living's facilities operated independently. While there was communication amongst the facilities as far as best practices, each facility was allowed to decide whether and to what extent it would use Genetworx and how it would manage testing of residents and staff at the facility.

### B.    Structure and Business of Genetworx

Recovery Centers of America was formed in 2014, and provides community-based substance abuse services. It is a large corporation that owns over 30 subsidiaries, It acquired Genetworx in 2017 so that it could insource its laboratory testing needs. Genetworx began COVID testing as early as March of 2020 (Boim 71:5-14)

Kevin McClure is the Chief Financial Officer of Recovery Centers of America, Inc. He

supervises the chief executive officer of Genetworx, reviewed and approved the form LSA and Amendment drafted by Genetworx's legal department, and signed the LSA and Amendment on behalf of Genetworx.

Stephanie Boim is the Vice President of Revenue Cycle at Genetworx. She was hired as director of revenue cycle for Genetworx in November of 2020 and was promoted to vice president sometime in late 2021 or early 2022. She now reports directly to Kevin McClure.

Katrine (Katy) Slavey was recruited by Stephanie Boim to join Genetworx in January of 2021, at which time she was hired as the Manager of Lab Revenue Cycle. She was responsible for, among other things, client invoicing, the revenue cycle's missing information team (which was responsible for making sure that Genetworx obtained all the information needed to submit tests to third-party payors or so that the tests could be invoiced to the appropriate client) and was responsible for Genetworx's accounts receivable.

Houston George was hired by Genetworx in June of 2020 as a senior account manager. He worked primarily in sales in the medical industry prior to joining Genetworx. Mr. George was the account manager for The Springs Living and its primary point of contact at Genetworx. He made sales pitches to Steven Berning at The Springs Living to induce Mr. Berning to execute the LSA and Amendment, and also was responsible for "onboarding" The Springs Living's different locations in Oregon and Montana.

## C.    The Execution of the Laboratory Services Agreement

In March of 2020, just as the COVID-19 pandemic began, Genetworx determined that it could utilize its lab equipment and expertise to enter the market to sell its laboratory services for COVID-19 testing. It ran financial analyses to assess the profitability of offering COVID-19 testing services and determined that doing so would be a profitable business venture for it.

An obvious source of profitability for Genetworx was funding for COVID-19 testing made

available pursuant to the Families First Coronavirus Response Act ("FFCRA"), the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, and the American Rescue Plan Act of 2021. The reimbursement program established and funded by those acts was administered by the Health Resources & Services Administration ("HRSA"). Pursuant to guidance issued by HRSA, claims for reimbursement were required to be submitted within 365 days of the date of service. Reimbursement was subject to available funding. Due to insufficient funding, HRSA ceased processing claims submitted after March 22, 2022.

After deciding to enter the COVID-19 testing market, Genetworx began ramping up its hiring of sales representatives and laboratory and billing staff to successfully market its services and to meet anticipated COVID-19 testing demands. Houston George was hired in the midst of Genetworx's upscaling of its COVID-19 testing. Stephanie Boim was hired because Genetworx needed someone "stronger" than their existing billing manager to run the Revenue Cycle department.

To build its portfolio of clients, Genetworx targeted senior care communities. It had existing business relations with senior care communities and used that foothold to broaden its reach into the COVID-19 testing market. Houston George communicated with Steven Berning about the formation of a relationship between Genetworx and The Springs Living. To induce The Springs Living to enter into the LSA, Mr. George explained to Mr. Berning that the out-of-pocket cost to The Springs Living would be minimal because Genetworx "will bill insurance for everyone who has it and The Cares Act Fund for any who do not. We will only bill The Springs Living for test that do not get paid by either one of those sources."

Another material consideration to Mr. Berning in entering into the LSA was that the agreement was non-exclusive, meaning, The Springs Living could continue using other labs it had

been using for COVID-19 testing services. The Springs Living used at least two other labs prior to Genetworx, one of which billed insurance and the other of which did not. The Springs Living limited its use of the lab that did not bill insurance because it wanted to minimize its out-of-pocket cost for COVID-19 testing.

As a result of Mr. George's representations, Mr. Berning executed the LSA and two of The Springs Living's communities (The Springs at Butte and The Springs at Wilsonville) immediately onboarded with Genetworx to begin using its services. Genetworx had each of the two locations fill out an account setup form, which included identifying a billing contact. Each of the locations identified Terri Cook as the billing contact, and provided Ms. Cook's telephone number.

Even after The Springs Living executed the LSA, Mr. George repeated his assurances that costs to The Springs Living would be minimal because Genetworx would bill insurers and HRSA for those without insurance. In an October 28, 2020, after the LSA was executed and The Springs began submitting orders for testing to Genetworx, Mr. George reconfirmed in an email to Mr. Berning that Genetworx bills Medicare and Medicaid for residents and insurance payors for staff members that have insurance and the HRSA fund for those without insurance, and that, "[o]nly if we cannot collect from one of those sources will you see a bill. . . . Our contract with you will only come into play if we are not allowed to bill insurance or the CARES Act fund now or in the future for staff testing."

Later, in a November 16, 2020, email, Mr. George again represented that "if [Genetworx] cannot bill the CARES Act, we will bill [The Springs Living] and I want to control your costs to be as little as possible. . . . [A]ll insurances have to pay for PCR based COVID tests, without penalties, copays, deductibles, or restrictions to receive any CA funds. In-Network status and deductibles do not apply to COVID testing." Mr. George assured that Genetworx used a third-

party vendor to verify insurance status to make sure Genetworx could bill the appropriate insurer or submit the claim to HRSA for reimbursement. Given that The Springs operates senior living communities and provides healthcare benefits to its staff members, it reasonably expected that most, if not all, of the testing provided by Genetworx would be paid for by Medicare/Medicaid, insurance payors, or through COVID-19 relief funds.

### D. Genetworx's Standard Operating Procedures

#### 1. Receipt of processing of specimens

During the time period in question, Genetworx's clients would request Genetworx's services by collecting the specimen using a kit that Genetworx provided, filling out and printing a requisition form provided by Genetworx which would include specific patient demographic information, and submitting the specimen and the requisition form to Genetworx for testing.

A requisition could be filled out and submitted manually or through Genetworx's online portal. If the requisition was submitted through Genetworx's online portal, the client would print a hard copy of each requisition form and include it in the package of tests to be mailed to Genetworx for testing.

If the client needed to conduct a large number of tests (referred to as "batch testing"), it could submit a spreadsheet provided by Genetworx that set out the name and date of birth of each patient for which a specimen would be tested. For The Springs Living, Houston George instructed that one spreadsheet should be submitted for residents and another separate spreadsheet should be submitted for staff members, and that no information could be added to the spreadsheets beyond the patient name and date of birth. Once Genetworx received the batch testing spreadsheet, it would generate requisition forms, which the client would then print off and include in the package of samples to be mailed to Genetworx for testing.

Upon receipt of the specimen, Genetworx's Registration Team would review the sample

to make sure that the patient information on the specimen matched the patient information on the requisition form (i.e., patient name, date of birth, etc.) and ensure that the patient demographic information is entered into the laboratory information system, the sample is processed. If any patient information was missing, the Registration Team would send the client a specimen discrepancy form, requesting that the missing or incorrect patient information be supplied.

Importantly, Genetworx would not process a specimen if it did not have the patient's name and date of birth. Upon receipt, the specimen would be assigned an accession number (or ORM number), which would remain with the specimen throughout Genetworx's processing of the specimen and billing for its services as an identifying number.

Once the test (also referred to as an accession) is processed, Genetworx would "final report" the results. When an accession is final reported, it would then automatically populate into Genetworx's billing system. Geneworx would not bill for any test that did not have a result, so the final report was the trigger for the accession to then go to Genetworx's billing system.

## 2. *Genetworx's Revenue Cycle department*

Genetworx utilized a Revenue Cycle department to manage billing and payments for its services. It also utilized a billing platform referred to as Xifin. The Revenue Cycle Department consisted of four teams: Medical Records, Missing Information, Insurance Follow-Up, and Cash Posting.

After the Registration Team processes requisition, the medical records team is responsible for filing the paperwork received by the Registration Team and storing that information, and for the submission of medical records at the request of payers or providers.

Genetworx's Cash Posting Team was responsible for reconciling actual receipts against explanations of benefits/remittance advices and applying receipts to individual accessions within Genetworx's billing system

More central to this dispute are Genetworx's Missing Information and its Insurance Follow-Up Team. The Missing Information Team was responsible for managing and monitoring accessions that populate into XiFin for missing information that might prevent an accession from being billed to a third-party payor (i.e., insurer, Medicare, Medicaid) and for following up with individual clients to secure that missing information so that a clean claim can be sent to a payor.

Genetworx's Insurance Follow-Up Team was responsible for reaching out to payors that were billed a clean claim but who did not respond, and for following up on claims that were submitted but on which payment was denied.

### 3.    *Genetworx process for billing third-party payors*

A key aspect of this dispute centers on Genetworx obtaining and utilizing insurance information from The Springs Living. The LSA does not speak to insurance information. At the outset of the relationship between Genetworx and The Springs Living, Houston George requested that The Springs Living collect insurance information because HRSA would pay for testing only for truly uninsured patients. Mr. George further explained that Genetworx utilized a third-party vendor to check for insurance for patients prior to submission of requests for payment to HRSA.

By at least December of 2020, Genetworx began advising The Springs Living that insurance information for a patient did not need to be submitted with each requisition. Specifically, Molly Larkin, a Genetworx Account Manager that worked with Houston George on the account for The Springs Living, notified The Springs Living that, if insurance information has already been provided for a patient, Genetworx's "billing saves insurance information for [The Springs Livings'] location." so The Springs Living would not "need to keep submitting insurance info. If you have someone that changes policies that's the only time you would have to send in another copy of the card." Later in January of 2021, Ms. Larkin again advised The Springs Living that "[b]illing did confirm that we can stick to sending the insurance information once."

Stephanie Boim, vice-president at Genetworx and head of its Revenue Cycle department, confirmed that, if Genetworx had insurance information on file for a patient, its standard operating procedure was to first rely on any insurance information submitted with a requisition. If insurance information was not included with a requisition, the Revenue Cycle department would check other accessions and submit the accession per the information already in Xifin. For Hybrid-HRSA contracts, if no insurance information was on file for a patient, Genetworx would utilize one of its third-party insurance discovery vendors to determine whether the patient truly was uninsured. If so, the accession would be submitted to HRSA for reimbursement.

If Genetworx submitted or attempted to submit an accession that was rejected or denied by the payor due to missing or incorrect patient demographic or insurance information, its standard operating procedures called for it to reach out to the client three times to request corrected information before invoicing the client for the accession. Genetworx would also run insurance discovery to verify correct insurance or demographic information.

### 4.     *Genetworx invoicing process*

For Hybrid HRSA clients, Genetworx generated invoices every 30 days beginning in early 2021. Prior to that date, Genetworx did not issue any invoices for its Hybrid HRSA clients. Genetworx utilized a platform called Mimecast to send invoices to clients. However, Mimecast would delete the message if it was not opened within three days. As a result, many of its clients, including The Springs Living, did not receive invoices when they were emailed. To attempt to address this widespread issue, Genetworx instituted a practice of sending a follow-up email to clients to make sure invoices were received.

On January 29, 2021, Stephanie Farmer, a Missing Information Team lead for Genetworx, contacted Nicole Jemming, The Springs Living's Montana Regional Director of Operations, asking Ms. Jemming to confirm that she received invoices for services for December of 2020. Ms.

Jemming responded the same day that she did not receive any invoices and that she was confused because she believed there was no cost for Genetworx's services. A few days later, Ms. Farmer replied that Ms. Jemming could ignore the previous message and that Genetworx was working to have the issue resolved as quickly as possible.

On February 22, 2015, Devon Kinsley of Genetworx reached out to Nicole Marsh, an accounts payable specialist at The Springs Living, to confirm that she had received invoices that Mr. Kinsley said were emailed on February 16, 2021. Ms. Marsh responded the same day to let Mr. Kinsley know that the invoices had not been received and requested that they be resent. Mr. Kinsley then emailed Ms. Marsh again on February 26, 2021, asking if the invoices sent on February 23, 2021, were received. Ms. Marsh responded the same day that she had not received any invoices and requested that Mr. Kinsley attached the invoices as pdfs to an email back to her. He did not do so and only requested that she look in her spam folder. Houston George and Stephanie Farmer were both included in the email exchanges between Mr. Kinsely and Ms. Marsh.

Although Genetworx claims to have instituted the process of following up with clients to ensure they received invoices, no one from Genetworx made any other effort to address The Springs Living's inability to receive invoices via the Mimecast platform or to attempt to send invoices in any other way. As a result, although Genetworx claims that it was sending invoices to The Springs Living, The Springs Living did not actually receive any invoices from Genetworx until mid-2022. Prior to that time, no one from Genetworx attempted to communicate with The Springs Living about any past due invoices. In fact, Genetworx made the unilateral decision to continue accepting and processing tests even if a client was behind on invoices

### E.    The Amendment to the LSA

In June of 2021, Mr. George notified Steven Berning that the LSA would need to be amended to confirm the parties' prior understanding that Genetworx would seek reimbursement

for uninsured individuals from available federal and state COVID-19 relief funds.

On or about June 10, 2021, Mr. George sent to Mr. Berning a proposed amendment to the LSA ("Amendment"). The Amendment was prepared by Genetworx legal department. Mr. George explained to Mr. Berning that it was necessary to allow Genetworx to bill HRSA for uninsured tests.

The Amendment contains certain provisions that are central to this dispute. First, it states: "If not otherwise specified, GENETWORx shall bill client for all requisitions received without insurance information." When questioned about the provision, no one from Genetworx was able to explain what "[i]f not otherwise specified" was intended to mean or address. Stephanie Boim explained that this provision could not be applied as written because of Genetworx's obligation to bill HRSA for uninsured patients: "So if there was lacking insurance information or even if the client had documented uninsured patient, for example, we would still run it through insurance discovery and the like to make sure that we truly couldn't find insurance, and then we would submit the claim to HRSA."

Immediately following that provision, the Amendment then provides: "GENETWORx shall use commercially reasonable efforts to bill Lab Services to the appropriate insurance providers, Medicare/Medicaid, and/or any available federal or state relief funds (each a "Relief Fund" and collectively "Relief Funds") based on patient information provided by Client." Notably, Genetworx did not include any caveats to its obligation to use commercially reasonable efforts.

The Amendment further provides that any payments received from insurance providers, Medicare/Medicaid, and/or Relief Funds would constitute a credit to The Springs Living. The Amendment also states that "GENETWORx shall invoice [The Springs Living] for Lab Services performed during the prior month."  Client agrees to pay GENETWORx the invoiced amounts

within thirty (30) days following receipt of such invoice."

**F.    The Cigna Clawback**

Until 2021, Cigna administered The Springs Living's employee health plan. In June of 2021, Cigna audited claims submitted to it by Genetworx. The audit was not limited to testing performed for The Springs Living's employees—it included individuals covered by other plans administered or insured by Cigna. Cigna audited Genetworx because, it contended, Genetworx misrepresented the services it billed, did not render services as billed, or billed with missing information. Cigna demanded a refund from Genetworx of over $9 million.

Effective June 23, 2022, Cigna and Genetworx entered into a settlement agreement, pursuant to which Genetworx agreed to refund Cigna more than $2.7 million based on the audit Cigna conducted. Pursuant to the settlement agreement, Genetworx agreed to abide by Cigna's Medical Coverage Policy, which provides "that testing for the following 'non-diagnostic' purposes, among others, are not covered by Cigna and, therefore, Provider agrees it shall not submit claims to Cigna for tests performed for the following purposes: return-to-work /work place screening, return-to-school/school screening, participation in sports, and travel."

Neither Genetworx nor Cigna provided any notice of the investigation or the settlement to The Springs Living until Genetworx reached out to The Springs Living in mid-2022, after the settlement was finalized.

**G.    The Present Payment Dispute**

As discussed above, despite being on notice that The Springs Living was not receiving invoices from Genetworx, Genetworx did nothing to change how it sent invoices to The Springs Living. No one from Genetworx—not even Houston George—notified or discussed with The Springs Living any outstanding invoices until mid-2022, by which point Genetworx was claiming an outstanding balance of over $2 million.

On May 25, 2022, Houston George emailed Steven Berning regarding employee testing not being covered by Cigna and requesting a time to discuss with Genetworx's billing team. Mr. George then followed up on June 15, 2022, requesting a meeting to discuss The Springs Living's account.

Shortly thereafter, at least one conference call took place between Genetworx and The Springs Living at which the parties discussed the amount Genetworx was claiming as past due. During that conversation, which was attended by Steven Berning (and others) for The Springs Living, Mr. Berning asked why Genetworx had waited so long to approach The Springs Living about the amounts Genetworx was claiming it owed. In response, Genetworx's representatives admitted that they had gotten really far behind.

Following that initial conference call, The Springs Living obtained the allegedly past due invoices from Genetworx and began supplying patient demographic and insurance information Genetworx claimed it needed to submit the invoiced accessions to the appropriate payor. However, it was discovered during this process that Genetworx's invoices were inaccurate. Specifically, on August 12, 2022, Shyam Bhat for Genetworx notified Mark Quadro for The Springs Living that Genetworx "will need to revise the invoices themselves as there were a significant amount of accessions which either ended up having a payor or were for a separate client altogether."

## H.    ODHS reimbursement

Beginning in mid-2020, the state of Oregon mandated testing in nursing facilities, assisted living facilities, and residential care facilities, such as those operated by The Springs Living. In response to the increased costs associated with compliance with mandated testing, the Oregon Department of Human Services ("ODHS") began reimbursing for mandated staff testing.

Shortly after the billing dispute arose in mid-2022, The Springs Living learned about the availability of payments from the state of Oregon for staff testing at senior care facilities located

in Oregon. Notwithstanding that it was Genetworx's contractual obligation to use commercially reasonable efforts to bill amounts to state COVID-19 relief funds, The Springs Living began seeking reimbursement from the state of Oregon based on invoices received from Genetworx.

The Springs Living submitted invoices it received from Genetworx for tests Genetworx performed for The Springs Living staff members to ODHS for reimbursement. The Springs Living made those submissions on July 29, 2022, August 10, 2022, August 29, 2022, and September 15, 2022. Those submissions were based on invoices The Springs Living received from Genetworx on June 28, 2022, July 29, 2022, and August 19, 2022. ODHS reimbursed The Springs Living a total of $562,970.00 based on those submissions.

The Springs Living submitted a fifth request for reimbursement for staff testing performed by Genetworx on February 3, 2023. That submission was based on an invoice The Springs Living received from Genetworx on December 16, 2022. The Springs Living sought reimbursement in the amount of $439,090.00. On February 3, 2023, shortly after submitting its request for reimbursement, The Springs Living received notice from ODHS that ODHS no longer had funding to reimburse COVID-19 staff testing.

To be clear, all of the COVID-19 testing Genetworx did for employees at The Springs Living's Oregon facilities could have been reimbursed by the state of Oregon, including those for which Cigna retracted payment or refused to pay based on its Medical Coverage Policy. However, Genetworx did not submit a single test for reimbursement to the state of Oregon or even notify The Springs Living of its existence. The Springs Living submitted but did not obtain reimbursement on approximately $439,090 based on invoices issued by Genetworx because, by the time the request for reimbursement was submitted, the fund had been exhausted. The Springs Living currently is holding approximately $562,970 in funds received from the state of Oregon

based on invoices received from Genetworx, which it will return to the state of Oregon if it is determined that Genetworx is not entitled to recovery for those accessions.

## I.    Genetworx's Executive Summary/Damages Spreadsheet

In a written order following the on-the-record telephonic status conference held on January 4, 2024 (at which the Court instructed Genetworx to produce documents demonstrating that it used commercially reasonable efforts to seek reimbursement from insurers, federal/state programs, and COVID relief funds), the Court ordered Genetworx to "produce in discovery to Defendants all records pertaining to their submission for insurance reimbursement (to include reimbursement sought from state and federal governments) and the denial of the request for reimbursement" no later than January 31, 2024.

On February 21, 2024, following a February 16, 2024, status conference, Genetworx produced what has been referred to in this litigation as either the Damages Spreadsheet or the Executive Summary. The Executive Summary has been of substantial importance in this case, as it purported to reflect everything Genetworx did to submit claims for reimbursement to third-party payors. The Executive Summary was generated directly from Xifin, which Stephanie Boim characterized as the "source of truth" for Genetworx to determine what work the Revenue Cycle department had done on accessions before invoicing them to a client.

Ms. Boim testified that, while the Executive Summary was reviewed to make sure it accurately reflected the information in Xifin, it was not audited for compliance with Genetworx's standard operating procedures or for quality assurance. She also confirmed that a contact note would be entered every time a Genetworx representative "touched" an accession, such that the Audit Log Spreadsheet would have a complete set of all "touches" for every accession Genetworx processed for The Springs Living.

III.    **LEGAL ANALYSIS**

    A.    **Genetworx Cannot Enforce the LSA because It Breached Its Material Obligation of Using Commercially Reasonable Efforts to Bill Accessions to Third-Party Payors.**

"Under Virginia law, the elements of a claim for breach of contract are: (1) a duly executed and enforceable agreement; (2) the plaintiff's performance, or offers to perform, in accordance with the terms of the contract; (3) the defendant's breach or failure to perform under the agreement; and (4) actual damages sustained by the plaintiff that are recoverable under Virginia law." *Bryant v. Washington Mut. Bank*, 524 F. Supp. 2d 753, 757–58 (W.D. Va. 2007), aff'd, 282 F. App'x 260 (4th Cir. 2008). The burden of establishing each element of the claim falls on the plaintiff. *Carley Capital Group v. City of Newport News,* 709 F. Supp. 1387, 1396 (E.D. Va. 1989); *Johnson v. Washington*, E.D. Va. No. CIV.A. 2:07CV204, 2008 WL 850690, at *3 (E.D. Va. Mar. 12, 2008).

"'[A] party who commits the first breach of contract,' if material, 'is not entitled to enforce the contract' and thereby excuses the nonbreaching party from performance. 'A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract.'" *Virginia Elec. & Power Co. v. Bransen Energy, Inc.,* 850 F.3d 645, 655 (4th Cir. 2017) (quoting Horton v. Horton, 254 Va. 111, 487 S.E.2d 200, 203–04 (1997)).

Here, Genetworx failed to perform as required under the LSA, as amended. The LSA, as amended, required Genetworx to use commercially reasonable efforts to bill Lab Services to the appropriate insurance provider, Medicare/Medicaid, or to any available federal or state COVID-19 relief funds based on the patient information provided by The Springs Living.

A contractual obligation to use "reasonable efforts" imposes an obligation to act with good faith in light of one's own capabilities and in accordance with industry standards. *See E. Claiborne Robins Co. v. Teva Pharm. Indus.,* Civil Action No. 3:18cv827, 2020 U.S. Dist. LEXIS 177033,

at *35 (E.D. Va. Sep. 25, 2020) (applying New York law); *see also Soroof Trading Dev. Co. v. GE Fuel Cell Sys. LLC*, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012) (contractual obligation to use "reasonable efforts" required party to work in good faith and to the extent of its capabilities).

An obligation to use commercially reasonable efforts requires at least some conscious effort to achieve the agreed-upon goal, and a party that engages in no effort cannot be found to have engaged in commercially reasonable efforts. *E. Claiborne Robins Co. v. Teva Pharm. Indus*., No. 3:18cv827 (DJN), 2022 U.S. Dist. LEXIS 35232, at *6 (E.D. Va. Feb. 28, 2022) (applying New York law).

Here, Genetworx will not be able to establish that it used commercially reasonable efforts because the only available evidence shows that it repeatedly failed to submit accessions to third-party payors despite having adequate patient demographic and insurance information to do so. The Executive Summary is replete with instances where Genetworx had insurance information for a particular patient on file and received payment on some accessions for the patient, but in other instances for the same patient, Genetworx never submitted accessions to the payor that paid other accessions.

The evidence also shows that Genetworx failed to submit all accessions for uninsured patients to HRSA. The Executive Summary contains numerous instances where an accession for a patient was paid by HRSA but no other accessions for the same patient were submitted to HRSA. The Executive Summary also contains numerous instances where no insurance information was submitted but Genetworx never conducted insurance discovery, a prerequisite to submitting the accessions to HRSA. And not only did Genetworx fail to submit accessions to HRSA, it failed to make any efforts to submit accessions to ODHS for The Springs Living's staff members at its Oregon facilities.

The evidence also shows a consistent failure by Genetworx to follow its standard operating procedures. In addition to failing to conduct insurance discovery to verify whether a patient was truly uninsured, the Executive Summary shows that Genetworx failed to follow its policy of making three attempts to contact The Springs Living to obtain missing patient information. To be clear, those are not steps requiring Genetworx to go "above and beyond." Those are simply Genetworx's typical methods of conducting business.

### B.    Genetworx's Obligation to Use Commercially Reasonable Efforts to Bill Accessions to Third-Party Payors was not Dependent on The Springs Living Providing Insurance Information with Each Requisition.

Genetworx's primary argument in this dispute, based on the Amendment, is in essence that it did not owe any obligation to use commercially reasonable efforts for any requisition form submitted without insurance information. However, neither the language of the LSA, as amended, nor Genetworx's conduct supports its argument.

Virgina law posits that "[t]he contract is construed as written, without adding terms that were not included by the parties. When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning. Id. Moreover, the court presumes that the parties have not used words needlessly, and will give meaning to every word if a reasonable meaning can be given to it. Id.

"[T]he Virginia Supreme Court has 'consistently held that in the event of an ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement.'" *Multiscaff Ltd. v. Aptim Fed. Servs., LLC*, No. 1:23cv1369(DJN), 2024 U.S. Dist. LEXIS 11246, at *11-12 (E.D. Va. Jan. 22, 2024) (quoting *Drs. Co. v. Women's Healthcare Assocs., Inc.*, 285 Va. 566 (2013)). Furthermore, "the parties' interpretation and dealings with regard to contract terms are entitled to great weight and will be followed unless doing so would violate other legal principles." *Video Zone, Inc. v. KF&F Props., L.C.,* 267 Va. 621, 627 (2004) (citations omitted).

Here, the LSA, which Genetworx drafted, provides that "Genetworx shall use commercially reasonable efforts to bill the foregoing amounts to the appropriate insurance provider and/or Medicare/Medicaid based on the patient information provided on the requisition order." Genetworx argues that this language contractually obligated The Springs Living to provide adequate insurance information with each requisition. However, its interpretation requires rewriting the provision by deleting "patient information" and inserting in its place "adequate insurance information." Certainly, as the drafter of the LSA, Genetworx had every opportunity to specify what information it would require in order to bill the appropriate insurance provider and/or Medicare/Medicaid, but it failed to do so. Virginia law does not allow Genetworx to rewrite the LSA.

Genetworx likewise cannot rely on the Amendment to modify its obligation to use commercially reasonable efforts. The Amendment, also drafted by Genetworx, says: "If not otherwise specified, GENETWORx shall bill Client for all requisitions received without insurance information." Genetworx argues that this language allowed it to bill The Springs Living for any requisitions submitted without insurance information and that Genetworx was not obligated under the LSA and Amendment to take additional measures to attempt to bill third party payors for such tests. However, Genetworx's proffered interpretation of the Amendment ignores the qualifier, "[i]f not otherwise specified," which clearly indicates that exceptions existed to the provision that "GENETWORx shall bill Client for all requisitions received without insurance information." *See BAE Sys. Ordnance Sys. v. Fluor Fed. Sols., LLC,* Civil Action No. 7:20-cv-587, 2024 U.S. Dist. LEXIS 17020, at *17 (W.D. Va. Jan. 31, 2024) (concluding that the phrase "except as otherwise provided . . . necessarily implies that there are exceptions to this general provision provided elsewhere in the Subcontract.").

The plain language of both the LSA and the Amendment provide the exception to the provision regarding the submission of insurance information with reach requisition. The LSA states that "GENETWORx shall use commercially reasonable efforts to bill the foregoing amounts to the appropriate insurance provider and/or Medicare/Medicaid based on the patient information provided on the requisition order."  That language is left substantially unchanged in the Amendment: "GENETWORx shall use commercially reasonable efforts to bill Lab Services to the appropriate insurance providers, Medicare/Medicaid, and/or any available federal or state relief funds (each a 'Relief Fund' and collectively 'Relief Funds') based on the patient information provided by Client."  Genetworx repeatedly specified to The Springs Living in late 2020 and early 2021 that Genetworx's billing department saved insurance information so that The Springs Living did not need to send insurance information in with each requisition if they had already previously done so. Clearly, Genetworx "specified otherwise" by indicating that insurance information was not required to be submitted with each requisition to trigger Genetworx's "commercially reasonable efforts" obligation.

Genetworx's own standard operating procedures confirm its understanding that it was required to use commercially reasonable efforts notwithstanding the insurance information submitted with each requisition. Not only did the LSA as amended require it to submit bills for its services to any available federal and state COVID-19 relief fund, but HRSA specifically reimbursed only for uninsured individuals. Thus, as Stephanie Boim testified, Genetworx could "bill [The Springs Living] for all requisitions received without insurance information" because it had the contractual obligation of submitting accessions for uninsured patients to HRSA, which required Genetworx to conduct insurance discovery so that it could attest to the uninsured status of those patients. And Genetworx's standard operating procedure was to bill an accession to

whatever insurance information might have been discovered by running insurance discovery. Similarly, Genetworx stored insurance information in Xifin. Thus, if Genetworx already had insurance information on file for a patient and a requisition was received without insurance information, its standard operating procedures required it to submit the accession based on the insurance information already in its system.

As the drafter of both the LSA and Amendment, Genetworx had every opportunity to clearly and unambiguously define the parties' respective obligations in the event insurance information was not provided with a requisition, and how that might impact Genetworx's obligation to use commercially reasonable efforts to bill third-party payors, but it failed to do so. In fact, when it drafted the Amendment, the only caveat Genetworx included was to the provision that it would "bill Client for all requisitions received without insurance information." There is no similar caveat to its "commercially reasonable efforts" obligation.

While the availability of insurance information may have impacted Genetworx's ability to use commercially reasonable efforts to submit accessions to third-party payors, its obligation to use commercially reasonable efforts was not contingent on insurance information being submitted with each requisition. Certainly, if Genetworx used the tools at its disposal and otherwise satisfied its obligation to use commercially reasonable efforts to bill third-party payors—i.e., if it conducted insurance discovery based on patient information provided by The Springs Living and could not bill a test to a third-party payor—then The Springs Living would be responsible for paying for the test, subject to the other terms of the LSA. So, the "commercially reasonable efforts" clause does not, as Genetworx contends, negate the rest of the language of the LSA. To the contrary, interpreting it as a prerequisite to The Springs Living's responsibility for paying for any test is the only interpretation that squares with the contractual language and Genetworx's undisputed course

of performance.

**C.** **Genetworx Failed to Credit The Springs Living with Payments Received by Third-Party Payors.**

Not only did Genetworx breach its obligation to use commercially reasonable efforts, it also breached its obligation to credit The Springs Living's account with payments received from third-party payors. As the LSA, as amended, clearly states, Genetworx was obligated to credit payments received from insurance providers, Medicare/Medicaid, and/or Relief Funds to The Springs Living's account.

Per the Executive Summary, Genetworx claims it received payments from third-party payors on 20,362 accessions, for a total paid amount of $2,123,339.79 (an average payment of $104.28 per test). However, rather than credit that full amount to The Springs Living's account, Genetworx only credited those accessions as if each of those accessions was paid at $95 per test, amounting to a credit of only $1,934,390. Thus, The Springs Living is entitled to an additional credit of at least $188,949.79 on account of those paid claims.

**D.** **The Springs Living's Purported Failure to Provide Insurance Information with Each Requisition did not Cause Genetworx's Damages.**

"A claimant arguing entitlement to damages under a contract governed by Virginia law must do more than show their counterparty violated the governing instrument. It must demonstrate a 'causal connection between the . . . breach and the damages claimed,' and 'prove with reasonable certainty the measure of damages sustained . . . ." *United States for Use & Benefit of McKenney's, Inc. v. Leebcor Servs., LLC*, 622 F. Supp. 3d 165, 222–23 (E.D. Va. 2022) (quoting *Haass & Broyles Excavators, Inc. v. Ramey Bros. Excavating Co.*, 355 S.E.2d 312, 315 (1987)).

Here, Genetworx's sole evidence of damages is the Executive Summary. However, the evidence to be presented at trial demonstrates that Genetworx simply failed to submit accessions to the appropriate payor per the insurance information on file for the patient or to submit accessions

to HRSA or ODHS.

**E.    Genetworx's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing is Duplicative of Its Breach of Contract Claim.**

"Under Virginia law, every contract contains an implied covenant of good faith and fair dealing; however, a breach of those duties only gives rise to a breach of contract claim, not a separate cause of action." *Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 462 (E.D. Va. 2008) (citing *Charles E. Brauer Co. v. NationsBank of Va.*, N.A., 251 Va. 28, 33, 466 S.E.2d 382 (1996); *L&E Corp. v. Days Inns of America, Inc.*, 992 F.2d 55, 59 n.2 (4th Cir. 1993)).

Here, Genetworx cannot, as a matter of law, state a claim for breach of the implied covenant of good faith and fair dealing because it is duplicative of its breach of contract claim and fails for the same reasons discussed above.

**F.    Genetworx's Claim for Account Stated Fails because The Springs Living Never Consented or Acquiesced to Any Amounts Genetworx Claims It Owes.**

A claim on an account stated requires the plaintiff to plead and prove that the defendant consented or acquiesced to the amounts claimed to be owed. *Ellison v. Weintrob*, 139 Va. 29, 35, 123 S.E. 512, 514 (1924).

Here, Genetworx cannot offer any evidence that The Springs Living ever consented or acquiesced to the amounts Genetworx claims are owed. The Springs Living did not actually receive any invoices from Genetworx until mid-2022, and Genetworx was on notice that The Springs Living was not receiving Genetworx's invoices. Once The Springs Living received the outstanding invoices in mid-2022, it objected to the amounts Genetworx claimed were owed.

**G.    Genetworx's Claims for Quantum Meruit and Unjust Enrichment Fails as a Matter of Law because the LSA is an Enforceable Written Contract.**

Under Virginia law, claims for unjust enrichment and quantum meruit are appropriate only

in the absence of an enforceable contract. *JTH Tax, LLC v. Shahabuddin*, 477 F. Supp. 3d 477, 482 (E.D. Va. 2020) (*citing McPike v. Zero-Gravity Holdings, Inc.,* 280 F. Supp. 3d 800, 810 (E.D. Va. 2017)). Neither Genetworx nor The Springs Living disputes the enforceability of the LSA or the Amendment. Therefore, Genetworx's claims for Quantum Meruit and Unjust Enrichment, which are pled in the alternative, fail as a matter of law and should be dismissed.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, The Springs Living respectfully requests that the Court enter judgment in its favor and dismiss all of Genetworx's claims against it.

Respectfully submitted,

<u>/s/ *Kathryn E. Bonorchis*</u>
Kathryn E. Bonorchis #80007
LEWIS, BRISBOIS, BISGAARD &
    SMITH, LLP
100 Light Street, Suite 1300
Baltimore, Maryland, 21202
Telephone: 410-525-6409
Fax: 410-779-3910
Kathryn.Bonorchis@lewisbrisbois.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of November, 2024, a copy of the foregoing was served electronically through CM/ECF and/or e-mail to:

Robert T. Hicks (VSB No. 45462)
Allison K. Riddle (VSB No. 93727)
Bean, Kinney & Korman, P.C.
2311 Wilson Boulevard, Suite 500
Arlington, VA 22201
Telephone: 703-525-4000
Fax: 703-525-2207
rhicks@beankinney.com
ariddle@beankinney.com
*Counsel for Plaintiff*

Philip S. Rosenzweig, Esquire *(pro hac vice forthcoming)*
Malcolm S. Gould, Esquire *(pro hac vice forthcoming)*
PA Atty. I.D. Nos. 62461 /80254
900 East 8th Avenue, Suite 300
King of Prussia, PA 19406
*Counsel for Plaintiff*

/s/ Kathryn E. Bonorchis
Kathryn E. Bonorchis